### Richmond

EMILY HARRISON CARTER

v.

CHARLES HILL CARTER, JR.

April 30, 1982.

Record No. 791632.

Present: All the Justices.

*J. Madison Macon, Jr. (Brown, Macon and Nunnally,* on briefs), for appellant.

*B. Randolph Boyd (Randolph, Boyd, Cherry and Vaughan,* on brief), for appellee.

THOMPSON, J., delivered the opinion of the Court.

On March 21, 1977, Emily Harrison Carter (Complainant)[1] filed a bill of complaint against her son, Charles Hill Carter, Jr. (Respondent), alleging that, "by fraud, deceit, misrepresentation of fact, undue influence, and/or other devious means," he had obtained her signature and acknowledgment to an alleged "boundary agreement" dated March 11, 1977, concerning 36 acres of land in Charles City County. Complainant prayed that the court declare the agreement void, that Respondent be required to produce the agreement for cancellation, and that she be afforded other appropriate relief. Respondent denied the charges. After an *ore tenus* hearing on June 11, 1979, the trial court held that Complainant had not established her allegations and dismissed the bill of complaint. We affirm the decree of the trial court.

---

[1] Emily Harrison Carter died while this appeal was pending. Code § 8.01-20 does not require revival or substitution of parties.

On or about February 1, 1974, Complainant, an 84-year-old widow residing on Shirley Plantation, Respondent's home, fell and broke her hip. She was hospitalized for approximately 60 days and then entered a Hopewell nursing home. The court appointed Respondent her committee, and he undertook the management of her affairs.

In 1975, Respondent as committee, brought a suit to partition "The Forest", a large tract of land owned jointly by Complainant and another son, Shirley Harrison Carter. Respondent named as defendants Complainant and her three children, Shirley Harrison Carter, Gertrude Carter Macon, and himself. A court-ordered survey of the property precipitated a disagreement as to the boundary between "The Forest" and two adjoining properties, "Shirley Woods" which the Respondent owned, and "High Hills" which Shirley Harrison Carter owned. During the pendency of the partition suit, a new plat allocated the 36 acres now in controversy to the Complainant, and both Respondent and his brother, Shirley Harrison Carter, signed the plat acknowledging this fact. "The Forest" was then partitioned by deed—187 acres to Shirley Harrison Carter and 223 acres to Complainant; the partition suit was dismissed; and on February 15, 1977, the court formally declared Complainant competent to manage her own affairs.

Respondent grew dissatisfied with the allocation of the 36 acres to Complainant, and on March 11, he prepared a document for Complainant's signature disclaiming any intention to own the 36 acres in dispute.[2] He carried the document to his mother in the nursing home. She signed it, and her sitter witnessed her signature. Then, Respondent telephoned his attorney and related the preceding events. His attorney advised him that the document would not accomplish his purpose. Respondent immediately prepared a second document, the "boundary agreement,"[3] and re-

---

[2] The document, dated March 11, 1977, stated:

I, Emily Harrison Carter, never intended to include in my half-part of "The Forest" any land except that shown to be my part of "The Forest" according to the original LaPrade survey dated September 1975.

I wish to exclude the 36 acres that are part of "Shirley Woods" as shown on the 1817 map. This land was willed to my son, Charles Hill Carter, Jr., from Robert Randolph Carter through his daughter, Marion Carter Oliver [sic].

s/ Emily Harrison Carter<br>March 1977

*Witnessed by:*          s/ Mrs. Catherine Williams

[3] The "boundary agreement" dated March 11, 1977, stated:

turned to the nursing home the same day, accompanied by an attorney and a Notary Public. Complainant executed the "boundary agreement," and the Notary acknowledged her signature. On March 14, Respondent recorded the instrument. One week later, Complainant instituted this suit.

Complainant stated in her May 31 deposition, taken in the presence of the trial judge, that she believed her children had affection for her; that she did not believe that any one of them would try, by fraud, deceit, or misrepresentation, to do anything to her; that she recognized her signature on the "boundary agreement" but that she had signed it without reading it. The sitter testified that Respondent persuaded Complainant to sign a document, telling her it was about "going back to the South House," but when she (the sitter) signed the document, Respondent's briefcase covered the text. Respondent denied that he concealed the agreement and stated that he had returned to the nursing home that afternoon with the "boundary agreement" after consulting with his attorney. He testified that he read and explained the agreement to his mother and showed her a plat. He remembered her reading the agreement. The attorney testified that Complainant looked "in real good shape" and was "very keen"; that she read the agreement and asked Respondent several questions, although he did not remember Respondent reading the document to her. The Notary substantially corroborated the attorney's testimony.

■ We set forth our standard of review in *Barnes* v. *Craig,* 202 Va. 229, 234-35, 117 S.E.2d 63, 67 (1960). When a chancellor hears evidence, *ore tenus,* his decree acquires the same weight as a jury's verdict. We may only reverse the decree if it is plainly

I, Emily Harrison Carter never intended to include in my one half part of "The Forest" any land which did not originally belong to "The Forest" the original and true boundaries of which are shown on the LaPrade Survey of "The Forest" dated March 22, 1976, a copy of which is attached hereto.

I wish to exclude the 36 acres more or less that is a part of "Shirley Woods" from "The Forest", which 36 acres are shown on two plats attached to a recently recorded partition deed between myself and my son, Shirley Harrison Carter, which partitions "The Forest". This land was willed to my son, Charles Hill Carter, Jr. from Robert Randolph Carter—through his daughter Marion Carter Oliver, and to that end I give and grant to the said Charles Hill Carter, Jr. with general warranty and English Covenants of Title, the aforesaid 36 acres more or less, they being shown as Parcel 5 and that part of parcel 6 north of Kimages Creek on the first plat attached to the aforementioned partition deed.

s/ Emily Harrison Carter (Seal)

wrong or without evidence to support it. We examine the record in the light most favorable to the prevailing parties and determine whether substantial credible evidence supports the chancellor's decision. *Accord, White and P & W Oil Co.* v. *Perkins,* 213 Va. 129, 189 S.E.2d 315 (1972); *Flippo* v. *Broome,* 202 Va. 919, 121 S.E.2d 490 (1961); Code § 8.01-680.

The Complainant argues that the relationship of the parties and her failure to read the document support her fraud allegations. We disagree. When a plaintiff alleges fraud or coercion, he has the burden of proving it by clear, cogent and convincing evidence. *Malbon* v. *Davis,* 185 Va. 748, 40 S.E.2d 183 (1946), a case factually similar to the one before us, illustrates this principle. The plaintiff, Davis, an 80-year-old farmer, conveyed his land to Malbon, his grandson, in consideration of Malbon paying $336.11 in delinquent taxes and an outstanding $396 debt to a third person. Later, Davis testified that he only intended to record his debt to Malbon, not to convey the property. He denied that the attorney who drew up the deed read it to him. Testimony from those present at the transaction refuted Davis' testimony. The trial court found fraud and undue influence, but this court ruled that the evidence was insufficient to support that decision. We reasoned that adults deal with each other as adults. Differences in age and close relationship of blood do not destroy this rationale, especially when one party charges another with fraud. *Id.* at 756, 40 S.E.2d at 187. Merely showing that a mother-son relationship exists will not support a charge of either actual or constructive fraud. Further, Complainant's deposition belies her present assertions.

Complainant next relies on her failure to read the "boundary agreement." The long established rule in Virginia places the responsibility on the grantor to read the deed. Failure to read it will not relieve him of obligations entered under it, and will not constitute fraud unless the grantee prevented the grantor's reading or induced the grantor not to read it. *Hicks* v. *Wynn,* 137 Va. 186, 195-96, 119 S.E. 133, 136 (1923).

Further, Complainant contends that the lack of consideration for the transfer supports an inference of constructive fraud. The chancellor drew the contrary conclusion from the circumstances, and we think the evidence abundantly supports that conclusion. In *Planters Nat. Bank* v. *E. G. Heflin Co.,* 166 Va. 166, 173, 184 S.E. 216, 219 (1936), this court said:

Mere failure of consideration or want of consideration will not ordinarily invalidate an executed contract. The owner of the historic estate . . . can give it away, and he can sell it for a peppercorn. Courts, though they have long arms, cannot relieve one of the consequences of a contract merely because it was unwise.

Complainant principally relies upon *Jackson* v. *Seymour,* 193 Va. 735, 71 S.E.2d 181 (1952). We think her reliance is misplaced. In *Jackson,* a brother, acting as the financial adviser to his widowed sister, bought from her a tract of land for $275. Soon afterwards, he sold the land's timber for more than ten times the purchase price. The evidence further revealed that the land contained other valuable timber, a fact unknown to either party prior to the sale. The court found constructive fraud for three reasons: The intimate relationship of the parties, the grossly inadequate consideration, and the ignorance of both parties of the presence of the valuable timber on the tract.

The instant situation differs greatly. Respondent had a bona fide claim to the 36 acres, declaring that it had originally belonged to him and he had agreed to the allotment under the misapprehension that family peace would be restored; when that did not materialize, he sought restoration of what he had conveyed away. Familial amenities would suggest that he probably should have discussed the matter with his brother, sister, and brother-in-law, but the law does not compel this. The family relationship had deteriorated to the point where the parties were dealing with each other at arms' length. The chancellor, having personally heard the testimony of all the witnesses, was required to make findings of fact, and he concluded that no fraud, duress, deceit, or other impropriety had been employed by Respondent in the execution of the boundary agreement of March 11, 1977. His findings are amply supported by the evidence. Accordingly, the final decree of August 7, 1979, will be

*Affirmed.*